# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff**

**-vs-**                                                                                       **Case No. 2:10-cr-107-FtM-29DNF**

**LEROY THOMAS,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration on the Defendant, Leroy Thomas' Substitute[1] Motion to Suppress Evidence (Doc. 22) filed on November 20, 2010. The Defendant asserts that the detention of the Defendant was unlawful, and therefore all subsequent statements made by the Defendant during the detention should be suppressed. On November 12, 2010, the Government filed a Response to Motion to Suppress (Doc. 21). The Defendant is charged in an Indictment (Doc. 1). In Count One, the Defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§922(g)(1), 924(e) and Section 2. In Count Two, the Defendant is charged with possessing with intent to distribute 5 grams or more of a mixture or substance containing a detectable amount of crack cocaine, in violation of 21 U.S.C. §841(a)(1) and 841(b)(1)(B)(iii) and 18 U.S.C. §2. In Count Three, the Defendant is charged with possessing with intent to distribute a quantity of a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §841(a)(1) and 841(b)(1)(C), and

---

[1] The Defendant filed a Motion to Suppress (Doc. 16) on November 5, 2010, and later filed the Substitute Motion to Suppress Evidence (Doc. 22).

18 U.S.C. §2. In Count Four, the Defendant is charged with possessing a firearm in the furtherance of a drug trafficking crime in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(C), and 18 U.S.C. §§924(c)(1)(A)(i), and 2.

## I. Evidence

The Government presented the testimony of the following officers from the Fort Myers Police Department: Detective Candace Petaccio, Officer Michael Tomaselli, and Detective Eric Gutridge. The Government introduced into evidence the Search Warrant, the Incident Recall, an aerial photograph, and a photograph of the residence. (Gov. Exh. 1-4). The Defendant introduced into evidence a Quit Claim Deed. (Def. Exh. B). The Defendant did not present any witnesses.

### A. Search Warrant

On May 11, 2010, the Honorable Judge Sherra Winesett signed a state Search Warrant for the residence located at 2723 Market Street, Fort Myers, Florida. (Gov. Exh. 1, p. 1-3). The Search Warrant authorized the search of the premises, vehicles on the premises, and the curtilage. (Gov. Exh. 1, p. 1). The grounds for the issuance of the Search Warrant was a violation of Fla. Stat. §893.13, for the sale and possession of cocaine. The Search Warrant authorized the search of the premises for cocaine, paraphernalia for the manufacture, distribution, and ingestion of cocaine, records of financial transactions from the purchase or sale of cocaine, proceeds from the sale of cocaine, illegally possessed firearms maintained for the purpose of protecting the cocaine, articles of personal property intending to establish the identity of the persons in control of the premises, and indicia of ownership or control of the residence. (Gov. Exh. 1, p. 2). The Search Warrant further provided that Fort Myers Police Department Officers or Detectives:

> are hereby commanded to search the location described and named above being in Lee County, Florida, serving this Warrant and making the search of said location and any

      persons found therein and or involved in this investigation in the daytime or nighttime, as the exigencies of the occasion may demand or require, or on Sunday, with the proper and necessary assistance and if the property above described is found there, to seize it and arrest all persons in the unlawful possession thereof, leaving a copy of this Warrant and a receipt for the property taken and prepare a written inventory of the property seized and return this Warrant and bring the property and all persons arrested before a court having competent jurisdiction of the offense.

(Gov. Exh. 1, p. 3).

### B. Detective Petaccio

Detective Petaccio is a detective in the Special Investigations Group of the Fort Myers Police Department. (Tr.[2] p. 6). On May 13, 2010 at approximately 2:30 p.m., Detective Petaccio began conducting pre-warrant surveillance of the 2723 Market Street (the "residence") that was the subject of the search warrant. (Tr. p. 6-7, 11). Detective Petaccio was conducting pre-warrant surveillance to notify the lead detective and the SWAT Team of any hazards, of individuals arriving or leaving the residence, and of anything else such as safety issues that they might need to know prior to executing the search warrant. (Tr. p. 12). She was sitting in an unmarked vehicle in the general area of the residence. (Tr. p. 11). She saw a green mini-van sitting in the driveway of the residence. (Tr. p. 11). A short while after she began her pre-warrant surveillance she saw the Defendant's son, Michael Thomas enter the green mini-van, and proceed to drive the green mini-van away from the residence. (Tr. p. 12, 14). Detective Petaccio identified the driver as Michael Thomas by a photograph that she received in her operational plan. (Tr. p. 15, 16). She followed the green mini-van and radioed for other officers to stop the green mini-van. (Tr. p. 16). It was stopped on Edison Street, at a gas station. (Tr. p. 16-17). Detective Petaccio testified that she requested that the green mini-van be stopped because the SWAT team was on the way to execute the Search Warrant, Michael Thomas was a target

---

[2] "Tr." refers to the Transcript of Motion Hearing (Doc. 29) filed on January 7, 2011.

of the investigation, and he was a recent resident of the residence. (Tr. p. 17-18). Michael Thomas was stopped, detained, and eventually brought back to the residence after the residence was cleared for the officers' safety. (Tr. p. 18).

Detective Petaccio continued her pre-warrant surveillance of the residence and saw a black Nissan arrive at the residence. (Tr. p. 18). The Defendant exited the residence and got into the passenger seat of the Nissan. (Tr. p. 18-19). The Nissan left the residence at approximately 3:18 p.m. per the dispatch log. (See, Gov. Exh. 2). Detective Petaccio followed the Nissan and immediately radioed to dispatch to have an officer conduct a stop of the Nissan. (Tr. p. 19, 20). She followed the Nissan until she saw the Nissan stop, the Defendant exit the Nissan, and the officers detain the Defendant. (Tr. p. 20, 21). She did not stop the Nissan because she did not want to scare anyone in the residence who may destroy the evidence inside the house. (Tr. p. 19). Detective Petaccio also testified that the Search Warrant had not been executed at the time that the black Nissan left the residence. It did take officers longer to stop the Defendant because the available officers in the vicinity were called to the stop of the green mini-van. (Tr. p. 20, 38-39). The Defendant exited the black Nissan at 3:19 p.m. in the vicinity of the stop of the green mini-van, and the officers detained the Defendant at 3:21p.m. per the dispatch log. (See, Gov. Exh. 2, Tr. p. 23-24). This detention occurred approximately three blocks from the residence, and the residence was not visible from the stop. (Tr. p. 20-21, 38). The officers never stopped the black Nissan because there were not enough officers available to stop it. (Tr. p. 21, 50). The Nissan was later seen going through the gas station and then continuing on its way. (Tr. p. 40-41, 44). It was a little over three minutes from the time the black Nissan left the residence to the time the Defendant was detained. (Tr. p. 24).

The SWAT team arrived at the residence at 3:36 p.m. (See, Gov. Exh. 2. Tr. p. 24). After the SWAT team cleared the residence making it safe for the officers, the Defendant was returned to the residence. (Tr. p. 25). The Defendant was a main target of the investigation, and Detective Petaccio wanted to detain him for investigative purposes. (Tr. p 27) There were concerns for safety if the Defendant returned to the residence without being detained.[3] (Tr. p. 28).

### C. Officer Tomaselli

Officer Tomaselli works in the Community Offenders and Probation and Education Department of the City of Fort Myers Police Department. (Tr. p. 53). On May 13, 2010, he was on road patrol in a marked patrol vehicle.(Tr. p. 53-54). He was assigned to provide assistance regarding a Search Warrant at 2723 Market Street. (Tr. p. 54). Officer Tomaselli was to be available at the residence for any emergency transport needed. (Tr. p. 59, 62). He was heading to the residence when he heard on the radio that assistance was needed regarding an individual to be detained. (Tr. p. 55). He learned that an officer wanted a Nissan to be stopped, and he headed toward where the Nissan was last seen. (Tr. p. 55). He saw a person later identified as the Defendant on foot walking on the southside of Edison Avenue. (Tr. p. 56). He approached the Defendant, and detained him. (Tr. p. 57). Officer Tomaselli detained the Defendant approximately two minutes after he saw him. (Tr. p. 57). The Defendant was patted down, handcuffed, and placed in Officer Morales' patrol vehicle. (Tr. p. 58). Officers did not follow the Nissan because no patrol cars were available to stop it. (Tr. p. 68). Officer Tomaselli followed the SWAT team to the residence, and Officer Morales stayed with the Defendant until the residence was cleared, and then drove the Defendant to the residence. (Tr. p. 59).

---

[3] On cross-examination, counsel for the Defendant introduced the deed to the property and raised the issue of whether the Defendant was the actual owner of the property. However, counsel did not relate the ownership of the residence to an issue relating to suppression.

Officer Tomaselli estimated that the time between the initial detention of the Defendant and when he arrived at the residence to be approximately fifteen (15) minutes. (Tr. p. 59-60).

### D. Detective Gutridge

Detective Gutridge works in the Special Investigations Unit of the Fort Myers Police Department. (Tr. p. 70). He was the detective in charge of the execution of the Search Warrant at 2723 Market Street, and drove the SWAT team to the residence. (Tr. p. 71). Detective Gutridge briefed the members of the team prior to the search. (Tr. p. 71). He received information from the Lee County Property Appraiser's Office that the homeowner of the residence was Leroy Thomas, the Defendant. (Tr. p. 72). He gave this information to Detective Petaccio. (Tr. p. 72). He also obtained a photograph of the Defendant prior to the execution of the Search Warrant. (Tr. p. 73). Detective Gutridge knew that the Defendant was a convicted felon prior to executing the search. (Tr. p. 87-88). When the SWAT team arrived at the residence, the team approached the front and rear of the residence, knocked, and announced its presence. (Tr. p. 73). The SWAT team secured the inner and out perimeter and the exit points of the residence. (Tr. p. 73-74). The area within a block of the residence was secured. Detective Gutridge did not go into the residence. (Tr. p. 74).

The SWAT team entered the residence a reasonable time (a few seconds) after knocking and announcing. (Tr. p. 74-75). The team breached the front door of the residence. (Tr. p. 75). Subjects were attempting to escape out the rear of the residence. (Tr. p. 75). The Defendant was brought to the residence after the residence was secured. (Tr. p. 75-76). Detective Gutridge estimated that it was between fifteen (15) to twenty (20) minutes after the Defendant was detained that he was brought to

the residence. (Tr. p. 81). Detective Gutridge read Miranda[4] rights to the Defendant, and the Defendant acknowledged that he understood his rights. (Tr. p. 76, 77). Detective Gutridge also read the Search Warrant to the Defendant. (Tr. p. 76). The Defendant made statements to Detective Gutridge regarding the firearms and the contraband found in the residence as well as admitted that he was a convicted felon. (Tr. p. 78-79, 81).

## II. Analysis

The Defendant argues that the detention of the Defendant after he left the residence was not lawful, and therefore, any statements he made subsequent to his detention should be suppressed. The Government argues that the detention of the Defendant was lawful and the statements made by the Defendant should not be suppressed. The leading case on the authority of police officers to detain a person while executing a search warrant is the Supreme Court's opinion in *Michigan v. Summers*, 452 U.S. 692 (1981). In *Summers*, police officers were about to execute a search warrant of a house for narcotics when they encountered the defendant descending the front steps of the residence. *Id*. at 693. The officers asked for his assistance in gaining entry to the residence and detained him while the premises was searched. *Id*. The officers arrested the defendant after they found narcotics in the residence and determined that the defendant owned the home. *Id*. The officers also searched the defendant and found heroin in his pocket. *Id*. The Supreme Court found,

> The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

>identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Id.* at 703-704. Further, the detention of an occupant of the premises that is implicitly authorized by the search warrant "although admittedly a significant restraint on his liberty, [is] surely less intrusive than the search itself." *Id* at 701. To determine if the detention of an occupant of a premises being searched is justified, the Supreme Court considered "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. . . Finally the orderly completion of the search may be facilitated if the occupants of the premises are present." *Id*. at 702. The Supreme Court held that "for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id*. at 705.

The Supreme Court later elaborated on the *Michigan v. Summers*, *supra* opinion in *Muehler v. Mena*, 544 U.S. 93 (2005). "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. at 705, n. 19).

The issue in this case is whether the officers had the authority to detain the Defendant after he left the premises and was approximately three blocks away from the residence. The Eleventh Circuit addressed a similar issue in *United States v. Sears*, 139 Fed.Appx. 162 (11th Cir. 2005)[5]. In *Sears*, the officers obtained a search warrant that authorized a search of a residence, the people connected

---

[5] Eleventh Circuit unpublished opinions are not binding precedent but they may be cited as persuasive authority. 11th Cir. R. 36-2.

to the residence, and all vehicles within the curtilage. *Id*. at 164. Prior to the search warrant being executed, the defendant was seen leaving the residence, getting into his car, and driving away. *Id*. The officer conducting pre-warrant surveillance followed the defendant, and approximately 100 feet from the residence stopped the defendant. *Id*. The officers told the defendant that the police were "getting ready to execute a search warrant for narcotics at [the defendant's] house." *Id*. The officers handcuffed the defendant and took him to a secure location. *Id*. Using a key provided by the defendant, the officers conducted a search of the residence and found narcotics. *Id*. The defendant argued that the officers did not have reasonable suspicion to stop or search his vehicle. *Id*. at 165. The Eleventh Circuit held that "[b]ecause the officers had a valid warrant to search [the defendant's] home, they had a basis to detain him during the search." *Id*. at 165-166 (citing *Michigan v. Summers*, 452 U.S. at 705)). The Eleventh Circuit found that it was irrelevant whether the officers had probable cause to stop the defendant's vehicle based upon the officer's having a warrant to search for contraband in the residence which gave the officers the authority to detain the occupants of the residence. *Id* at 165-166 (citing *Michigan v. Summers*, 452 U.S. at 705). The Eleventh Circuit relied on the case of *United States v. Cochran*, 939 F.2d 337 (6th Cir. 1991).

      The facts in *Cochran* are similar to the case at bar as well. In *Cochran* prior to a search warrant being executed, the defendant left the residence by car. *United States v. Cochran,* 939 F.3d 337, 338 (6th Cir. 1991). The defendant traveled a short distance before the officers stopped him. *Id*. The defendant argued that the seizure of his person was unlawful. *Id*. The defendant argued that *Summers* was distinguishable because in *Summers* the defendant was descending the steps of the residence when detained whereas in *Cochran* the defendant had driven away from the residence. The Sixth Circuit did

>not find this distinction significant, however, *Summers* does not impose upon police a duty based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is upon police performance, that is, whether the police detained defendant as soon as practicable after departing from his residence. Of course, this performance-based duty will normally, but not necessarily, result in detention of an individual in close proximity to his residence.

*Id*. at 339.

The Eleventh Circuit agreed with the Sixth Circuit's reasoning "that no constitutional violation occurs when officers who are preparing to serve a valid search warrant stop and detain an individual who is in the process of leaving the premises to be searched. That the stop does not occur on the premises to be searched is irrelevant so long as the officers detain the individual as soon as practicable after his departure." *United States v. Sears*, 139 Fed. Appx. at 166, *See also, United States v. Bailey*, 468 F.Supp.2d 373 (E.D. NY 2006) (Court determined detention lawful, when during pre-warrant surveillance, resident observed leaving apartment and was detained one mile from residence).

In the instant case, during pre-warrant surveillance, Detective Petaccio saw the defendant leave the residence, get into the black Nissan, and drive away. She radioed for officers to stop the black Nissan, and then she followed the black Nissan. She saw the Defendant exit the Nissan and saw officers stopping him. In light of *Summers*, *Muehler*, and *Sears*, the initial detention of the Defendant was proper. The Defendant traveled approximately three blocks prior to being detained by the officers. He was followed by Detective Petaccio from the moment he left the residence. The actions by the police officers were not improper in light of the short distance that was traveled by the Defendant. Further, the officers did detain the Defendant as soon as practicable after he left the residence in light of the fact that no officers were available to stop him sooner. In addition, the officers were concerned that the Defendant might return to the residence or notify someone in the residence. A detention in open view of the residence could have potentially alerted the subjects inside

the residence, allowing them to flee, destroy evidence, or arm themselves and possibly frustrate the entire purpose of the search warrant.

The Defendant cites to *United States v. Reinholz*, 245 F.3d 765 (8th Cir. 2001) and *United States v. Edwards*, 103 F.3d 90 (10th Cir. 1996) to support the proposition that the detention of the Defendant was unlawful. *Reinholz* is distinguishable from the instant case. In *Reinholz*, the state court judge issued a search warrant for the defendant's residence and for his person for narcotics and other items. *United States v. Reinholz*, 245 F.3d at 771. The officers went to the defendant's office and stopped him as he was leaving work, detained him, and then drove him to the residence to execute the search warrant. *Id*. The court determined that the defendant was arrested and not simply detained while the search was being conducted. *Id*. at 777. The court found that the defendant's detention could not be justified under *Summers* because the defendant was not on the premises being searched when he was detained and he was nowhere near the residence. *Id*. at 778. Therefore, the court found the arrest of the defendant not to be justified under *Summers* as a legitimate detention of an occupant of a premises to be searched. *Id*. In the instant case, however, the Defendant was an occupant of the residence immediately prior to the search warrant being executed, therefore, *Reinholz* is factually distinguishable from the instant case, and is not applicable.

The Defendant also cited to *United States v. Edwards*, 103 F.3d 90 (10th Cir. 1996) to support the proposition that the detention of the Defendant was unlawful. However, in the later Tenth Circuit case of *United States v. Castro-Portillo*, 211 Fed.Appx. 715 (10th Cir. 2007), with facts similar to the instant case, the Tenth Circuit distinguished *Edwards*. The Tenth Circuit cited the reasoning in *United States v. Cochran*, 939 F.2d 337 (6th Cir. 1991) to support its determination that the "the search warrant in this case carried with it the limited authority to detain [the defendant] as an occupant during

the search of this house." *Id*. at 721. The Court determined that *Edwards* was distinguishable because it was decided prior to *Muehler*. *United States v. Castro-Portillo*, 211 Fed.Appx. at 721. Therefore, the Court does not find *Edwards* to be persuasive.

In conclusion, the initial stop and detention of the Defendant prior to and while a search of the residence was being conducted was valid. The Defendant was detained away from the residence for legitimate safety reasons, and was detained as soon an practicable by the officers. There is no evidence of any delay or that the officers were attempting to manipulate the situation. Moreover, only approximately fifteen minute passed from the time of the Defendant's detention until he was returned to the residence. Therefore, the Court finds that the stop and detention of the Defendant was lawful pursuant to *Summers*.

The Defendant also argues that because his detention was unlawful, that any statements made by the Defendant after his detention should be suppressed. However, the Court finds that the Defendant was not improperly detained, and therefore, the Court need not address the arguments raised as to this issue.

Therefore, it is **RESPECTFULLY RECOMMENDED**:

The Substitute Motion to Suppress Evidence (Doc.22) be **DENIED**, and the statements of the Defendant not be suppressed.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this __14th__ day of January, 2011.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record